**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CASEY FLEMING, ROBERT KING, and KEVIN CARBONNEAU, <br><br> Plaintiffs, <br><br> v. <br><br> TOWN OF OXFORD, ROBERT LANCIANI, individually and in his official capacity, ALISON NOVAK, individually and in her official capacity, KATHLEEN FLYNN, individually and in her official capacity, ALFRED BANFILL, individually and in his official capacity, KENNETH SELLERS, individually and in his official capacity, LAURENT MCDONALD, individually and in his official capacity, RIKE STERRETT, individually and in his official capacity, JENNIFER CALLAHAN individually and in her official capacity, and JENNIFER WARREN-DYMENT individually and in her official capacity, and ROBERT SMALL, <br><br> Defendants. | **CIVIL ACTION NO. 23-CV-40081** |

**COMPLAINT**

PRELIMINARY STATEMENT

1. Since 2015, Casey Fleming and Kevin Carbonneau have operated an online business known as HereBDragons, from their home. As part of their business Mr. Fleming and Mr. Carbonneau breed bearded dragons and sell them to online purchasers. When Mr. Fleming and Mr. Carbonneau, along with Robert King (collectively "Plaintiffs") purchased their home located at 59 Quobaug Avenue in Oxford, Massachusetts (the "Home") in June of 2018, they began operating HereBDragons out of the Home. As part of their house-hunting process, Plaintiffs reviewed the Town of Oxford's zoning bylaws to confirm they could continue to run

1

their business as an at-home business from 59 Quobaug Avenue. In early 2021, Plaintiffs hired Robert Small, a home contractor, to make improvements to the Home. While working at the Home in or around February of 2021, Mr. Small became irate and walked off the job while spewing hateful rhetoric and homophobic slurs directed at Plaintiffs as he stormed away. Shortly thereafter, Mr. Small filed a false complaint with the Oxford Board of Health, in which he made certain false allegations and fabricated various health and safety violations he claimed to have seen while working at the Home. Based on Mr. Small's spurious, false, and wholly baseless report, the various municipal defendants, at times acting individually and at times acting in concert, launched a harassment campaign against Plaintiffs that has included multiple forced inspections and re-inspections of the Home, the issuance of multiple cease and desist orders, multiple orders to correct conditions at the Home, repeated invasions of Plaintiffs' privacy and intrusions into their private lives, and interference with the quiet enjoyment of their Home – all without any legitimate basis or legal justification. Due to the actions of the various defendants, Plaintiffs have been injured and suffered embarrassment, public ridicule, reputational harm, emotional distress, and have been damaged economically as their business has suffered as a direct result of the defendants' actions.

PARTIES

2.      Plaintiff Casey Fleming is an individual residing in Oxford, Worcester County, Massachusetts 01540.

3.      Plaintiff Kevin Carbonneau is an individual residing in Oxford, Worcester County, Massachusetts 01540.

4.      Plaintiff Robert King is an individual residing in Oxford, Worcester County, Massachusetts 01540.

5. Defendant, Town of Oxford, is a municipal corporation duly organized and existing under the laws of the Commonwealth of Massachusetts, located at 325 Main Street, Oxford, Worcester County, Massachusetts 01540.

6. Defendant, Robert Lanciani, former Oxford Building Commissioner, is an individual residing at 237 Worcester Road, Sterling, Worcester County, Massachusetts 01545.

7. Defendant Alison Novak, former Oxford Director of Public Health, is an individual residing at 10 Brookwood Drive, Johnston, Rhode Island, 02919.

8. Defendant Kathleen Flynn, Oxford Animal Control Officer, is an individual residing at 34 Douglas Road, Sutton, Worcester County, Massachusetts 01590.

9. Defendant Alfred Banfill, Oxford Inspector of Wires, is an individual residing at 19 Maid Marion Street, Oxford, Worcester County, Massachusetts 01540.

10. Defendant Kenneth Seller, Oxford Fire and Emergency Services Deputy Chief, is an individual residing at 223 Ramshorn Road, Dudley, Worcester County, Massachusetts 01540.

11. Defendant Jennifer Callahan, Oxford Town Manager, is an individual residing at 3 Wheelock Street, Oxford, Worcester County, Massachusetts 01540.

12. Defendant Jennifer Warren-Dyment, former Oxford Assistant Town Administrator, is an individual whose residential address is unknown, but whose current principal place of business located at 140 Worcester St., West Boylston, Massachusetts, 01583.

13. Defendant Laurent McDonald, Oxford Fire Chief, is an individual residing at 8 Thayer Pond Drive, Unit 6, North Oxford, Worcester County, Massachusetts 01537.

14. Defendant Robert Small, is an individual residing at 10 Mossman Road, Westminster, Worcester County, Massachusetts 01473.

15.     Defendant Rike Sterrett, Oxford Director of Public Health, is an individual residing at 137 Rochambeau Avenue, Unit 3, Providence, Providence County, Rhode Island, 02906.

## JURISDICTION AND VENUE

16.     Jurisdiction of this Court is premised on 28 U.S.C. §§ 1331 and 1343.

17.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b)(2) because the events giving rise to the complaint took place in Massachusetts.

## FACTS AND ALLEGATIONS

### Plaintiffs Move to Oxford and Operate Business Without Issue

18.     In 2018, Plaintiffs were actively seeking to purchase a house in which they could live and from which they could operate the Business.

19.     Before submitting an offer to purchase the Home, Plaintiffs reviewed Oxford's then-current zoning bylaws and determined that Oxford's zoning ordinances and bylaws allowed them to operate the Business from the Home.

20.     In June of 2018, Plaintiffs purchased the Home and began operating their at-home Business in July 2018.

21.     Upon information and belief, the Town, its Building Commissioner Robert Lanciani ("Lanciani") and its Inspector of Wires Alfred Banfill ("Banfill") were aware of the operation of the Business since at least 2019.

22.     At all times subject to this complaint, Plaintiffs owned each Bearded Dragon at the Home and the business was exempt from licensure as a Pet Shop under M.G.L. c. 129, §39A.

**Home Renovations and Municipal Inspections**

23.    Plaintiffs devote substantial time and energy into operating the Business and take abundant precautions to provide for the safety and well-being of their Bearded Dragons.

24.    As operators of the Business, Plaintiffs breed and care for the animals until they are mature enough to be sold to new owners.

25.    Plaintiffs own every Bearded Dragon under their care. Neither as part of the Business nor in their personal capacities do Plaintiffs accept Bearded Dragons owned by others into their Home or otherwise care for Bearded Dragons belonging to others.

26.    After moving into the Home in 2018, Plaintiffs decided to perform certain renovations, particularly to the garage.

27.    These renovations were motivated and designed to increase and improve Plaintiffs' ability to care for their Bearded Dragons.

28.    Plaintiffs handled some aspects of the renovations themselves and hired contractors to perform other parts of it.

29.    In 2019, while the renovations were underway, Lanciani and Banfill inspected the Home.

30.    During their inspections, Lanciani and Banfill inspected the garage area and observed the at-home Business in active operation.

31.    After his inspection, Banfill told Lanciani and Plaintiffs that the wiring installed by Plaintiffs was lawful and did not require any electrical permits.

32.    After completing his inspection of the Home, Lanciani issued Plaintiffs' a building permit allowing them to close up the walls by installing insulation and drywall.

33.     The renovations stalled during the Covid-19 epidemic and Plaintiffs could not engage contractors to adequately staff the job to finish the work.

34.     Ultimately, the renovations were put on hold through February of 2021.

### Plaintiffs Hire Robert Small to Complete the Renovations

35.     In late January of 2021, Plaintiffs hired Robert Small, a home contractor, to complete the renovations. The agreed cost of the renovations exceeded $1,000.00.

36.     While working at the Home in or around February of 2021, Small became irate and walked off the job while spewing hateful rhetoric and homophobic slurs directed at Plaintiffs as he stormed away.

37.     Mr. Small told Plaintiffs that he quit without finishing the contracted for work, because of a disagreement with the Plaintiffs as to the location of a ceiling fan.

38.     After walking off the job, Small attempted to extort Plaintiffs.

39.     Small demanded Plaintiffs pay him money and, in exchange, he would not file complaints with the Town various administrative boards.

40.     Small threatened to have the Business shut down if they did not cower to his threats.

41.     Small further attempted to intimidate and cause Plaintiffs to fear him by boasting about a dental office that he did contracting work at, which had a permitting issue that caused the business to shut down.

42.     Small is not registered in the Commonwealth as a Home Improvement Contractor and does not hold a contractor's license, despite purporting to being insured.

43.    After storming away from the Home, Small called the Town's Board of Health and falsely claimed that he observed numerous health and safety violations when he was at the Home (the "Small Report").

44.    Upon information and belief, Small first called the Building Department to falsely report the building code violations he purportedly observed at the Home.

45.    The secretary that Small spoke to documented his complaint and emailed it to Novak and Lanciani.

46.    Small intentionally provided false information to the Building Department in an effort to harass Plaintiffs.

47.    When he contacted the Building Department, Small fabricated various code violations knowing that the Town would respond by sending various inspectors and officials to the Home.

48.    Even though it was completely false and wholly fabricated, the Small Report was effective in causing various municipal officials to inspect the Home and provided cover for the campaign of harassment Plaintiffs have suffered by the hands of the Town's inspectors.

**Lanciani Fraudulently Obtains An Administrative Search Warrant and Various Municipal Officials Inspect the Home**

49.    As a result of the baseless Small Report, Lanciani coordinated various departments of the Town to conduct an inspection of the Home, which included representatives from the Building Department, Fire Department, Health Department, Animal Control, Inspector of Wires, and the Plumbing Inspector.

50.    On or about February 26, 2021, Plaintiffs submitted a records request concerning Small's complaint.

51.     At the time of submission of the records request, Warren-Dyment was the records access officer that handled the request.

52.     It wasn't until March 25, 2021, that Warren-Dyment finally responded to Plaintiff's record's request- which by law was to be acted on within 10 business days.

53.     On or about March 3, 2021, Lanciani called Plaintiffs to demand they provide access to the Home at 10:00 AM the next morning, when various Town inspectors and officials would collectively inspect the Home.

54.     Plaintiffs told Lanciani that they were not available for inspection on such short notice and asked whether the inspection could be rescheduled to a mutually-agreeable day and time.

55.     Instead of working cooperatively with Plaintiffs to identify a date and time for the inspection that was acceptable to everyone, Lanciani responded aggressively, repeatedly asking the Plaintiffs if he was being denied access to the property, implying he would seek an administrative search warrant to enter the home.

56.     Plaintiffs were taken aback by Lanciani's aggressive response and display of open hostility towards Plaintiffs.

57.     Lanciani's demand for immediate access to the Home was wholly unnecessary and unjustified.

58.     Rather than engage with an overly aggressive Lanciani, Plaintiffs attempted to discuss his conduct with the Town's Board of Selectmen.

59.     However, Plaintiffs' calls to the Town's Board of Selectmen were intercepted by Jennifer Callahan ("Callahan"), Town Manager.

60. Callahan told Plaintiffs that the Board of Selectmen would not return Plaintiffs' calls. Callahan also falsely told Plaintiffs that the Board of Selectman had no jurisdiction over municipal administrative matters involving the conduct of municipal employees such as Lanciani.

61. Rather than subjecting themselves to Lanciani's combativeness, Plaintiffs attempted to directly contact the various Town departments by letters sent via certified mail.

62. In those letters, Plaintiffs expressed their willingness to schedule any necessary inspections of the Home.

63. For instance, Plaintiffs amicably coordinated Defendant Alison Novak's ("Novak") inspection of the Home on March 8, 2021.

64. Without any authority or permission from Plaintiffs, Novak photographed the interior of the Home during her inspection.

65. Primarily, Novak's photographed the interior, personal spaces of the Home.

66. Subsequently, Novak caused these photographs to be published to the public when she incorporated them into a public document.

67. Upon the completion of her inspection, Novak told Plaintiffs that she did not find any code violations or other indications of any insect infestation.

68. The Town's Animal Control Officer, Kathleen Flynn ("Flynn") also contacted the Plaintiffs to schedule an inspection. She requested Plaintiffs schedule a time for her to inspect the Home to allow her to determine whether Plaintiffs were required to obtain a special permit to operate the Business from their Home.

69. Because the question of whether a special permit is required for Plaintiffs to operate their Business is well outside the scope of Flynn's official duties, her request for an inspection to do so far exceeds her authority.

70. On or about March 23, 2021, Lanciani petitioned Worcester Superior Court for the issuance of an administrative warrant to inspect the Home.

71. Despite indicating to Plaintiffs that there were no code violations, Novak assisted Lanciani in seeking the administrative warrant.

72. In support of his petition, Lanciani filed an affidavit attesting under oath to purported facts he knew were false, including, but not limited to:

    a. "On or about February 18, 2021, the Building Department received a complaint alleging unsanitary conditions at the Property including insect infestation, the keeping and sale of exotic animals (bearded lizards), and other conditions dangerous to the health and safety of the occupants, general public, abutters and first responders, including but not limited to exposed electrical wire and electrical cords, as well as the presence of numerous space heaters and space lamps (believed to be for the lizards)."

    b. "…I attempted to inspect the Property and I was denied access."

    c. "[Plaintiff] admit[ted]…he employed an unlicensed contractor to perform work under the building permit."

    d. "…[Plaintiff] refused to grant me access."

    e. "...[Plaintiff] admitted to the Director of Public Health Services that he undertook the electrical work in the basement himself without proper licensing or a proper permit, raising immediate concern regarding the likelihood of an electrical fire in the residential neighborhood were the Property is located."

73. Lanciani committed perjury when he swore to the veracity of these statements because he knew they were false at the time he signed the affidavit.

74. Lanciani abused the administrative warrant process by supporting his petition with a sworn statement containing material statements he knew to be false at the time he attested to their veracity.

75. Lanciani willfully engaged in this misconduct for the purpose of harassing Plaintiffs and causing them distress.

76. On or about March 23, 2021, Lanciani, along with Novak, Sellers, Banfill, and Flynn, acting under the color of law pursuant to a fraudulently obtained Administrative Search Warrant, entered, searched, inspected, and photographed the Home.

77. Throughout the inspection, Lanciani taunted Plaintiffs, stating that he issued the original building permit knowing that Plaintiffs could never close the permit due to the existence of "unpermitted"-but legal- electrical wiring.

78. During this inspection, Lanciani told Plaintiffs:

   a. He did not need to make an appointment because the Administrative Search Warrant was "his appointment.";
   b. He had the power to arrest Plaintiffs if he was not given immediate access to the Home;
   c. He waived his cell phone in front of Plaintiffs indicating that he was prepared to call the police immediately;
   d. He referred the building permit he previously issued as putting Plaintiffs in a "Catch-22" because he never intended to approve the work due to his belief that the electrical work was not permitted, even though Banfill previously told him that the wiring was legal and that no permit was needed for the electrical work.

79. The search of the Home exceeded the scope of the warrant and included a search of Plaintiffs' private areas of the Home, including bedrooms, bathrooms, kitchen, and living spaces.

80. During the inspection, Defendants photographed of the interior of the Home, including private rooms and spaces. These photos did not include any alleged code violations.

81.     The Administrative Search Warrants did not authorize the inspecting defendants to access, inspect, or photograph these personal, private spaces in the Home.

82.     Defendants accessed and photographed these personal, private spaces to harass Plaintiffs and to cause them embarrassment.

83.     Defendants later caused these photographs to be published to the public.

84.     The photographs are still publicly accessible.

**Defendants Demand Plaintiffs Cease And Desist The Business
With Administrative Orders**

85.     After the inspection, Banfill, Lanciani, Sellers, Novak, and Flynn  served Plaintiffs with orders to correct various purported violations of Oxford Zoning By-Laws, state statutes, state sanitary cords, building codes, state fire codes, and electrical codes.

86.     The orders to correct were served after 5:00pm, on Friday, April 2, 2021 – Good Friday.

87.     The orders to correct directed Plaintiffs to immediately remove all animals at the Home, which were the pets of Plaintiffs.

88.     To further harass Plaintiffs and to interfere with and prevent them from conducting a lawful business from their the Home, Banfill, Lanciani, Sellers, Novak, and Flynn issued orders to correct that were based on inaccurate material facts and violations of non-applicable parts of Oxford Zoning By-Laws, state statutes, state sanitary code, building codes, fire codes, and electrical codes.

89.     For example, no fuel powered space heaters were present at the Home at the time of the March 23, 2021 inspection.

90.     Despite the absence of any fuel powered space heaters, Plaintiffs were cited for violating CMR 410.200B, 202, which establishes proper ventilation of fuel powered space heaters.

91.     Deputy Chief of the Fire Department Kenneth Sellers also demanded Plaintiffs remove all animals from the property.

92.     As the Deputy Fire Chief, Sellers had no power to demand Plaintiffs remove all animals from their property. Sellers's demand to Plaintiffs exceeded the scope of his authority.

93.     Without any basis in fact, Flynn criminally cited Plaintiffs for animal abuse.

94.     On or about February 10, 2022, the Home was re-inspected by Defendant McDonald and Sellers purportedly to resolve and close out the April 2, 2021, orders.

95.     In the days leading up to the February 10, 2022, inspection, Plaintiffs reminded the inspecting defendants that their inspection was subject to a confidentiality agreement being drafted between the parties and that they should not enter or photograph private areas of the Home. The inspection was allowed with the expressed understanding that the confidentiality agreement would be completed and defendants would sign it.

96.     Despite Plaintiffs' protestations and Defendants' assurances that the scope of the February 20, 2022, inspection would limited, they again – with the exception of the bedrooms – illegally entered and photographed Plaintiffs' personal, private spaces without permission.

97.     Defendants undertook this action, even though they knew of Plaintiffs complaints and concerns regarding such conduct, to continue to harass Plaintiffs.

98.     Based on their observations during the February 10, 2022 inspection, Sterrett, Banfill, and Sellers issued further orders to correct that, again, contained falsehoods, were not

13

supported by the conditions of the Home during the inspection, and cited violations of inapplicable regulations.

99.    Plaintiffs appealed Sterrett's March 5, 2022 orders to correct to the Oxford Board of Health, which held hearings on April 6 and April 14, 2022.

100.    During the hearings, Plaintiffs were outrageously attacked by the Town's counsel. Given that the subject of the Sterrett's orders to correct and Plaintiffs' appeal largely focused on whether how to categorize electric cables in the garage, Plaintiffs were shocked when Town counsel suggested the death penalty, telling the board, "I think you could do the death penalty."

101.    In her testimony to the board, Sterrett made various false and misleading statements, such as alleging that a nuisance odor emanated from the Home and that the Home is electrically overloaded.

102.    Plaintiffs also appealed Banfill's March 16, 2022 order to correct to the Board of Electricians' Appeals.

103.    A hearing was held on the matter on April 25, 2022.

104.    The board issued its ruling on June 23, 2022, overturning Banfill's March 16, 2022 orders to correct.

105.    Despite the board's action to overturn Banfill's prior orders and two months passing since the February 22, 2022 inspection, On or about April 11, 2022, Chief McDonald sent Plaintiffs additional orders to correct.

106.    Despite the order to correct being dated two months after the inspection, McDonald alleged certain code violations observed during the February 20, 2022 inspection "posed a serious and imminent safety risk."

107. As they were forced to do for the March 5, 2022 Sterrett order and the March 16, 2022 Banfill order, Plaintiffs promptly appealed McDonald's April 11, 2022 order to the Fire Prevention Regulations Appeals Board.

108. In response to Plaintiffs exercising their right to appeal his unlawful order to correct, McDonald retaliated against Plaintiffs by subjecting them to unscrupulous and abusive legal tactics solely intended to harass, intimidate, and pressure Plaintiffs into dropping their appeal.

109. McDonald's response to Plaintiffs' appeal consisted of 321 pages of material wholly irrelevant, unresponsive, and unrelated to the issues on appeal.

110. As part of his 321-page response, McDonald produced Plaintiffs' social media posts related to their personal and business lives – and were entire irrelevant to the proceedings before the board.

111. The sole purpose for Chief McDonald's response was to harass and intimidate Plaintiffs.

112. On or about December 19, 2022, the Fire Prevention Regulations Appeals Board reversed McDonald's April 16, 20022 order to correct. McDonald did not appeal this decision.

113. No Town official has inspected the Home since the March 23, 2021 inspection.

114. Despite the fact that he has not inspected the Home in roughly one year, McDonald issued another order on or about January 13, 2023.

115. McDonald's January 13, 2023 order states it is based on his observations from the March 23, 2021 inspection and the facts presented at the hearing before the Fire Prevention Regulations Appeals Board.

116. The April 6, 2022 order and the January 13, 2023 order made the same allegations about the same devices and only cite to different provisions of the code that the Home's conditions supposedly violate.

**Oxford Illegally Singles Out Plaintiffs To Prevent Them From Participating In The Local Political Process**

117. Motivated, in part, by their experiences with Town officials described above, Plaintiffs decided to develop warrant articles that would be considered by Oxford voters at the next Town Meeting.

118. Plaintiffs crafted articles designed to increase oversight and accountability of the Town, its officials, and its various departments.

119. For an article to be voted on at Town Meeting, an article needs to be supported by 100 registered voters.

120. Plaintiffs expended significant time and effort, over 120 hours, to obtain the required signatures, speaking with hundreds of town residents.

121. On or about September 7, 2021, Plaintiffs delivered petitions with the necessary number of signatures from registered Town voters supporting the Articles for consideration at the next Town meeting scheduled for October 2021.

122. The Registrar of Voters verified that each petition was supported by the signatures of more than 100 Oxford voters and the signatures were gathered and the petitions were submitted while the warrant for the Town Meeting was open.

123. Pursuant to M.G.L. c. 39 §10, the Town was required to discuss and vote upon the articles at the October 2021 Town Meeting.

124. Despite being legally required to present these articles for consideration at the Town Meeting, Callahan refused and illegally withheld them from the Town Meeting.

16

125.    During the December 12, 2022, meeting of the Oxford Board of Selectmen, the board members entered into an executive session pursuant to G.L. c. 30A, § 21(a)(1) to discuss an open meeting law complaint lodged by Mr. King, who had recently been elected to serve as a member of the Selectboard.

126.    During the executive session, Callahan falsely accused Mr. King of releasing confidential information, engaging in a pattern of behavior endangering town staff members and making baseless accusations against staff members, and compromising the security and safety of staff members.

127.    Callahan also falsely accused Mr. King of publishing personal, private, and identifying information about her, including publicly describing her and/or her family's vehicles.

128.    By making these false and baseless accusations against Mr. King, Callahan attempted to harm his reputation and standing within the Oxford community.

### Selective Enforcement/Discrimination

129.    The Town, Lanciani, Banfill, Novak, Flynn, Sellers, Callahan, Warren-Dyment, Sterrett, and McDonald have singled out Plaintiffs and selectively enforced the Town's zoning bylaws against Plaintiffs while failing to enforce same zoning bylaws in the same manner against other Oxford residents.

130.    For instance, Lanciani determined that Plaintiffs were in violation of the by-laws because they had not received a special permit to possess reptiles at the Home.

131.    Upon information and belief, Lanciani has not threatened to shut down Pets Supplies Plus, a business that also sells reptiles and other animals in Oxford, despite the fact that, like Plaintiffs, Pets Supplies Plus, does not have a special permit to possess reptiles.

132. Upon information and belief, no other Town officials have initiated other enforcement actions against Pet Supplies Plus.

133. For over a year, Town officials have focused their inspectional and oversight power on Plaintiffs, while ignoring open and obvious safety issues in Plaintiffs' neighborhood.

134. While focusing on Plaintiffs Business, Town officials have ignored:

a. a non-compliant chimney on a neighbors' home; and
b. a collapsing roof on a neighbors' garage and covered with a tarp.

135. The Town has allowed a property in the Town to act as a landfill, in violation of laws and regulations, despite numerous complaints from residents.

136. The Town has allowed a residential property to power an alternative home – a van- through extension cords and other wiring.

137. The above-noted conditions are easily visible from public rights of way, constitute open and obvious violations of the Town's bylaws that the Town knows about or should know about.

**Harm To Plaintiffs And Their Business**

138. The above-described actions were in parallel with a zoning board dispute between Plaintiffs and the Town.

139. During Zoning Board of Appeals hearings, Lanciani, Novak, and Banfill made various material and false statements concerning Plaintiffs and the Business, including, but not limited to:

a. false and unsubstantiated claims that the Business would spread salmonella;
b. claiming that Plaintiffs' kitchen, dining room and basement contained no personal affects and were exclusively for the use of the business; and
c. claiming that the garage was insulated and plastered without a permit.

140. Upon information and belief, as part of the harassment campaign targeting Plaintiffs, Defendants or individual acting on their behalf, created pseudonymous Facebook profiles for the purpose of sharing information about Plaintiffs, including details about their personal lives, taunting them, encouraging others to join the harassment campaign against Plaintiffs, which included encouraging community members to dig up details about Plaintiffs private lives through records requests to the Town, and to damage the reputation of the Plaintiffs in the community by claiming "that Plaintiffs hate oxford" and that "they are wasting taxpayer dollars".

141. Information provided through these postings included:

a. Plaintiffs names and address; and,
b. Proliferation and distribution of orders falsely alleging animal abuse and the existence of imminent safety hazards at the Home.

142. The above information was shared via Facebook, including the Businesses' Facebook page in an attempt to cast aspersions about the Business and to negatively impact Plaintiffs' Business and their business relationships.

143. The conduct of Town employees exceeded the scope of their enforcement authority.

144. The conduct of Town employees exceeded the scope of the administrative warrant.

145. The conduct of the Town employees constitutes an unreasonable, unwarranted, and unlawful intrusion of Plaintiffs' privacy rights secured under the United States Constitution and the Laws of the Commonwealth.

COUNT I
(Invasion of Privacy- Defendants Lanciani, Novak, Flynn, Banfill, Sellers, Callahan, Sterrett, and McDonald)

146. Plaintiffs hereby re-aver and re-allege the allegations in Paragraphs 1-145 as if specifically set forth herein and hereby incorporate them by reference.

147. The above-listed defendants used their status as Town officials to gain access to the Home over Plaintiffs' objections.

148. Defendants had no legitimate reason for searching personal, private locations within the Home or to photograph those locations.

149. The above-identified defendants accessed the Home and Plaintiffs' personal, private locations within the Home on multiple occasions without justifiable cause to do so.

150. Plaintiffs expressly told these defendants to limit the search of the Home to those locations that needed to be inspected for a legitimate reason or that were identified in the administrative search warrant, and demanded that no photographs of those locations within the Home that Plaintiffs identified as personal and private, or otherwise cause photographs of those locations to be published.

151. Defendants intentionally ignored Plaintiffs' rights and requests, repeatedly entered locations within the Home that were personal and private, repeatedly took photographs of those locations, and repeatedly published those photographs publicly.

152. Defendants' conduct constitutes an unreasonable, substantial and serious interference with the Plaintiffs' right to privacy protected by G.L. c. 214, § 1B.

153. As a direct and proximate cause of Defendants' actions and statements, Plaintiffs have suffered mental pain and suffering, emotional distress, humiliation, embarrassment, and subjected them to public ridicule.

154.    WHEREFORE, Plaintiffs demands judgment against Defendants for damages together with costs and interest thereon.

## COUNT II
(Defamation- Defendants Lanciani, Novak, Flynn, Banfill, Sellers, Callahan, Sterrett, and McDonald)

155.    Plaintiffs hereby re-aver and re-allege the allegations in Paragraphs 1-154 as if specifically set forth herein and hereby incorporate them by reference.

156.    Defendants' above-described conduct, consisting of oral and written statements as well as their conduct, damaged the character of Plaintiffs and caused them to be viewed with suspicion and constituted defamation against Plaintiffs.

157.    Defendants' above-described statements about the condition of Plaintiffs' Home and any alleged criminal activity within the Home were factually false and broadcast publicly.

158.    As a direct and proximate cause of Defendants' false and injurious statements, Plaintiffs have suffered mental pain and suffering, emotional distress, humiliation, and embarrassment.

159.    As a direct and proximate cause of Defendants' statements, Plaintiffs' business suffered as they were unable to carry on with the normal sale of bearded dragons.

160.    WHEREFORE, Plaintiffs demands judgment against Defendants for damages together with costs and interest thereon.

## COUNT III
(Intentional Infliction of Emotional Distress- All defendants)

161.    Plaintiffs hereby re-aver and re-allege the allegations in Paragraphs 1-160 as if specifically set forth herein and hereby incorporate them by reference.

162.    The conduct of Defendants constituted intentional infliction of emotional distress upon Plaintiffs.

21

163.    As a proximate and foreseeable result of Defendants' conduct, Plaintiffs suffered physical and emotional injuries, and suffered humiliation, embarrassment, and severe emotional distress, as well as loss of income.

164.    WHEREFORE, Plaintiffs demand judgment against Defendants for damages together with costs and interest thereon.

## COUNT IV
(Negligent Infliction of Emotional Distress- All defendants)

165.    Plaintiffs hereby re-aver and re-allege the allegations in Paragraphs 1-164 as if specifically set forth herein and hereby incorporate them by reference.

166.    The conduct of Defendants constituted negligent infliction of emotional distress upon Plaintiffs.

167.    Defendants knew or should have known that their actions would cause emotional distress, pain and suffering, mental anguish and embarrassment.

168.    As proximate and foreseeable result of Defendants conduct, Plaintiffs suffered injuries as described herein.

169.    WHEREFORE, Plaintiffs demand judgment against Defendants for damages together with costs and interest thereon.

## COUNT V
(Section 1983 - Defendants Lanciani, Novak, Flynn, Banfill, and Sellers)

170.    Plaintiffs hereby re-aver and re-allege the allegations in Paragraphs 1-169 as if specifically set forth herein and hereby incorporate them by reference.

171.    At all times subject to this complaint, Plaintiffs had a right to privacy secured by the 4th amendment to the United States Constitution.

22

172.   Defendants, acting under color of law, violated and invaded Plaintiffs' protected privacy rights by:

   a. Entering their Home based on a fraudulent affidavit;
   b. Exceeding the scope of the Administrative Warrant;
   c. Entering sensitive and private areas of the Home;
   d. Taking photographs of sensitive and private areas of the Home; and
   e. Causing those photographs to be published and publicly accessible.

173.   As proximate and foreseeable result of Defendants' conduct, Plaintiffs' suffered injuries as described herein.

174.   WHEREFORE, Plaintiffs demand judgment against Defendants for damages together with costs and interest thereon.

COUNT VI

(Violation of Article 14 of the Massachusetts Declaration of Rights - Defendants Lanciani, Novak, Flynn, Banfill, and Sellers)

175.   Plaintiffs hereby re-aver and re-allege the allegations in Paragraphs 1-174 as if specifically set forth herein and hereby incorporate them by reference.

176.   At all times subject to this complaint, Plaintiffs had a right to be secure from unreasonable searches of their Home as secured under Article 14 of the Constitution of the Commonwealth of Massachusetts.

177.   Defendants, violated Plaintiff's rights under Article 14 by:

   a. Entering their Home based on a fraudulent affidavit;
   b. Exceeding the scope of the Administrative Warrant;
   c. Entering sensitive and private areas of the Home;
   d. Taking photographs of sensitive and private areas of the Home.

178.   As proximate and foreseeable result of Defendants' conduct, Plaintiffs suffered injuries as described herein.

179.   Plaintiffs demand judgment against Defendants for damages in an amount to be determined by a jury.

<u>COUNT VII</u>
(Abuse of process - Defendants Lanciani, Novak, Flynn, Banfill, Sellers, Callahan, Warren-Dyment, Sterrett and McDonald)

180. Plaintiffs hereby re-aver and re-allege the allegations in Paragraphs 1-179 as if specifically set forth herein and hereby incorporate them by reference.

181. At all times relevant to the events set forth in this complaint, Plaintiffs had a right to be secure from unreasonable searches of their Home, a right to privacy, and a right not to be harassed and to be left alone.

182. Defendants used their positions of power to illegally interfere with Plaintiffs' rights.

183. Defendants abused their powers by repeatedly issuing citations without cause or facts to support their issuance, and by conducting multiple searches and/or inspections for an ulterior and illegitimate purpose – to harass and intimidate Plaintiffs, and force them to leave the Town.

184. As proximate and foreseeable result of Defendants' conduct, Plaintiffs suffered injuries as described herein.

185. WHEREFORE, Plaintiffs demand judgment against Defendants for damages together with costs and interest thereon.

<u>COUNT VIII</u>
(Violation of Article 19 of the Massachusetts Declaration of Rights -Defendant Callahan)

186. Plaintiffs hereby re-aver and re-allege the allegations in Paragraphs 1-185 as if specifically set forth herein and hereby incorporate them by reference.

187. At all times subject to this complaint, Plaintiffs had a right to petition the government to redress grievances as secured under Article 19 of the Massachusetts Declaration of Rights.

188.    Plaintiffs complied with all requirements to have their articles considered and voted on at Town Meeting.

189.    Defendants violated Plaintiffs' rights secured by Article 19 by depriving them their right to be heard and to petition their government.

190.    As proximate and foreseeable result of Defendants' conduct, Plaintiffs suffered injuries as described herein.

191.    WHEREFORE, Plaintiffs demand judgment against Defendants for damages together with costs and interest thereon.

<u>COUNT IX</u>
(Trespass - Defendants Lanciani, Novak, Flynn, Banfill, Sellers, Sterrett, and McDonald)

192.    Plaintiffs hereby re-aver and re-allege the allegations in Paragraphs 1-191 as if specifically set forth herein and hereby incorporate them by reference.

193.    At all times subject to this complaint, Plaintiffs had title to the House.

194.    At all times subject to this complaint, Plaintiffs had a right to restrict access to the Home.

195.    At all times subject to this complaint, Plaintiffs asserted their right to restrict access to the Home by Defendants Lanciani, Novak, Flynn, Banfill, Sellers, Sterrett and McDonald absent a valid search warrant.

196.    The Administrative Search Warrant obtained by Lanciani which granted Defendants Lanciani, Novak, Flynn, Banfill, and Sellers their authority to enter the Home was obtained fraudulently.

197.    Even if the Administrative Search Warrant was legitimately secured and valid, Defendants Lanciani, Novak, Flynn, Banfill, and Sellers exceeded the scope of the administrative

25

search warrant by entering areas of the Home objected to by Plaintiffs and not subject to search by the town Defendants.

198.    The invasion into the Plaintiffs' Home and private areas was without legal right and occurred repeatedly, despite Plaintiffs' objections.

199.    As proximate and foreseeable result of Defendants' conduct, Plaintiffs suffered injuries as described herein.

200.    WHEREFORE, Plaintiffs demand judgment against Defendants for damages together with costs and interest thereon.

COUNT X
(Article 1 Massachusetts Declaration of Rights - Defendants Lanciani, Novak, Flynn, Banfill, Sellers, Callahan, Warren-Dyment, and McDonald)

201.    Plaintiffs hereby re-aver and re-allege the allegations in Paragraphs 1-200 as if specifically set forth herein and hereby incorporate them by reference.

202.    At all times subject to this complaint, Plaintiffs were entitled to equal protection and application of the law.

203.    At all times subject to this complaint, Plaintiffs were deprived the full opportunity and access of laws.

204.    At all times subject to this complaint, Defendants Robert Lanciani, Defendant Allison Novak, Defendant Kathleen Flynn, Defendant Alfred Banfill, Defendant Kenneth Sellers, Defendant Jennifer Callahan, Defendant Jennifer Warren-Dyment, Defendant Rike Sterrett and Defendant Laurent McDonald singled out Plaintiffs and enforced laws against them that they did not impose on others similarly situated.

205.    As proximate and foreseeable result of Defendants' conduct, Plaintiffs suffered injuries as described herein.

206.    WHEREFORE, Plaintiffs demand judgment against Defendants for damages together with costs and interest thereon.

## COUNT XI
### (Defamation – Defendant Callahan)

207.    Plaintiffs hereby re-aver and re-allege the allegations in Paragraphs 1-206 as if specifically set forth herein and hereby incorporate them by reference.

208.    During the December 12, 2022, Board of Selectmen's meeting, Callahan accused Mr. King of releasing confidential information, engaged in a pattern of behavior that endangered Oxford's staff members by compromising their safety and security, and that he publicly disclosed personal, private information about her with ill intentions.

209.    Callahan's statements about Mr. King are false, devoid of any factual basis, and defamatory.

210.    Callahan's statements were intended to cause, and did cause, damage to Mr. King's reputation and to subject him to public ridicule and contempt within the Oxford community.

211.    Callahan intentionally made these statements knowing that they were false and that they would damage Mr. King.

212.    As a direct and proximate cause of Defendants' false and injurious statements, Plaintiffs have suffered mental pain and suffering, emotional distress, humiliation, and embarrassment.

## COUNT XII
### (Breach of Contract – Defendant Small)

213.    Plaintiffs hereby re-aver and re-allege the allegations in Paragraphs 1-212 as if specifically set forth herein and hereby incorporate them by reference.

214.    Defendant Robert Small entered into a contract with Plaintiffs to make certain improvements to their home.

215.    Plaintiffs paid Small and complied with their obligations of the contract.

216.    Small held himself out to Plaintiffs as an licensed contractor who could complete the work contracted within a reasonable amount of time and in a workmanlike manner.

217.    Small failed to complete the work for which he was contracted and paid to complete.

218.    As proximate and foreseeable result of Small's conduct, Plaintiffs were damaged in an amount to be determined by a jury.

COUNT XIII

(Violation of G.L. c. 265 §25 – Extortion - Defendant Small)

219.    Plaintiffs hereby re-aver and re-allege the allegations in Paragraphs 1-218 as if specifically set forth herein and hereby incorporate them by reference.

220.    Small, upon walking off the job, threatened to falsely accuse Plaintiffs of building code violations unless they pay him money to be quiet.

221.    When Plaintiffs refused, Small made a false report to the Town.

222.    Small made this false report with the intent to demean, harass, embarrass, and otherwise injure Plaintiffs.

223.    As proximate and foreseeable result of Small's conduct, Plaintiffs suffered injuries as described herein in an amount to be determined by a jury.

COUNT XIV

(Civil Conspiracy- All defendants)

224.    Plaintiffs hereby re-aver and re-allege the allegations in Paragraphs 1-223 as if specifically set forth herein and hereby incorporate them by reference.

225.    Defendants, using their position of power and influence, worked in concert to engage in a pattern of harassing and bullying behavior intended to deprive Plaintiffs of their rights of privacy, intimidate them into closing their at-home business operations, deprive them of the economic benefits of operating a profitable business, and influence them to sell their Home and move out of Oxford.

*226.*    Defendants, using their individual and unique positions of power and influence, in concert with one another caused Plaintiffs to suffer emotional distress and other damages.

### *Relief*

WHEREFORE, Plaintiffs request that this Honorable Court:

(1)    Award the Plaintiffs compensatory damages from Defendants in an amount to be determined by a jury.

(2)    Award Plaintiffs punitive damages from the Defendants in an amount to be determined by a jury.

(3)    Award the Plaintiffs interest, costs and reasonable attorney's fees for bringing this action.

(4)    Award the Plaintiffs such other relief as this Court deems just, equitable, and appropriate.

**PLAINTIFFS HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted

By their Attorney

Tristan P. Colangelo (BBO# 682202)
Kerstein, Coren & Lichtenstein, LLP
60 Walnut Street, 4th Floor
Wellesley, MA 02481
781-997-1600
tcolangelo@kcl-law.com

Dated: July 12, 2023